**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **LORIE POTTER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:14-CV-315 (MTT)** |
| ) | |
| **DOOLY COUNTY, GA.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

<u>**ORDER**</u>

Defendants Don Williford, Dooly County, and the Estate of Lucius Van Peavy[1] have moved for summary judgment.  (Doc. 37).  The motion is **GRANTED in part and DENIED in part**.

### I.       BACKGROUND

Plaintiff Lorie Potter worked part-time as an emergency medical technician ("EMT") for Dooly County Emergency Medical Services ("EMS").  (Doc. 48-6 ¶¶ 5, 79).  The EMS director was Williford.  (Doc. 37-17 at 109:5-23-111:16).  Independent of her work as an EMT, Potter and her husband Kelly were involved in the community and during this involvement had several issues with the Dooly County Sheriff's Office and Sheriff Lucius Van Peavy.  For example, the Potters owned two black Tahoes resembling police vehicles with license plates beginning with "GV."  (Doc. 48-6 ¶¶ 18-19).  Some thought these vehicles were Sheriff's Office's vehicles and complained that the vehicles were "exceeding the speed limit or otherwise being operated inappropriately."  (Docs. 37-15 at 15:9-13; 48-6 ¶¶ 18-19, 27-31).  Sheriff Peavy's son,

---

[1] The Court substituted the Estate of Lucius Van Peavy for Sheriff Peavy after he passed away.  (Doc. 16).

Craig Peavy, testified that he believed he had enough evidence to charge the Potters with impersonating an officer but decided against it.  (Doc. 37-13 at 45:9-51:8).  The Potters dispute that their vehicles did not comply with the law.  (Doc. 48-6 ¶ 40).  Kelly Potter also attended Unadilla (a town in Dooly County) city council meetings during which he attempted to persuade the city to end its contract with the Sheriff's Office and form its own police department.  (*Id.* ¶ 43).  Craig Peavy testified that Kelly would "bash" the Sheriff's Office at these meetings and get citizens "roweled up."  (Doc. 37-13 at 56:21-58:11).[2]  When Sheriff Peavy ran for re-election in 2012 (the election was held in November 2012), Potter and her husband publicly and financially supported a challenger, T.J. Williams.  (Docs. 37-17 at 48:11-21; 37-21 at 73:6-9; 48-6 ¶¶ 49-51).  Craig Peavy testified that his father was aware of Potter's support for Williams at least as early as September 2012.  (Doc. 37-13 at 77:6-79:17).

On September 24, 2012, Potter and her partner Jason White responded to a call at the Law Enforcement Center ("LEC") to see a sick inmate.  (Doc. 48-6 ¶ 64).  According to Nurse Debora Futch, who was on duty at the LEC, Potter and White ignored her, did not check the patient's vital signs, and did not ask her for any information about the patient.  (Docs. 37-24; 48-6 ¶ 65).  Potter testified that she did not see a nurse.  (Doc. 37-17 at 55:7-8).  After this incident, Futch complained about Potter's and White's conduct.  (Docs. 37-24; 48-6 ¶ 65).  Futch documented her complaints in a typed report.  (Doc. 37-24).

Shortly thereafter, Sheriff Peavy and Craig Peavy met with Williford to discuss the incident and the "attitude of the crew."  (Doc. 37-19 at 54:22-24, 57:6-10).  Sheriff

---

[2] Potter repeatedly objects to facts regarding her and her husband's issues with the Sheriff's Office as immaterial.  The Court disagrees.  They are relevant to the Defendants' proffered legitimate, nondiscriminatory reasons not to promote her and Sheriff Peavy's qualified immunity defense.

Peavy told Williford that Potter was not allowed anywhere in the LEC where the public could not go.  (Doc. 48-6 ¶ 74).  Craig Peavy testified that Sheriff Peavy said to Williford: "I don't need her back there behind those doors because the inmates['] safety is my responsibility[,] and if she's going to ignore the jail administrator and the nurse[,] I don't need her back there.  But I don't want it to affect her job."  (Doc. 37-13 at 71:19-25).  Potter, without citing to evidence contradicting this testimony, disputes that Sheriff Peavy said the ban should not affect her job.  (Doc. 48-6 ¶ 69).  Williford did not testify that Sheriff Peavy told him Potter was banned because of her and her husband's political support for Williams, but he did testify that it was not "odd" to him that Potter was the only one banned, given the history between the Potters and the Sheriff's Office, including the Potters' support for Williams and a prior issue either "several years back or several months back."  (Doc. 37-19 at 60:2-63:1).  But he would not reveal what he believed those "rumors" were and said "[it] didn't bother [him]" or affect his impression of Potter as an employee.  (*Id.* at 63:2-17).

On September 30, 2012, Potter spoke with Williford about Sheriff Peavy's decision in a recorded conversation.[3]  The conversation is disjointed, apparently because Potter was attempting to lead Williford in a direction Williford would not go.[4]  Williford explained that Sheriff Peavy did not want her past the "yard gates" at the LEC.  (Docs. 37-26 at 2:13-16; 49, Attachment D at 1:28-1:33).  Potter commented that "it's

---

[3] Potter surreptitiously recorded several conversations with Williford.  Neither Williford nor Dooly County makes an issue of this covert action.

[4] Potter's complaint and amended complaint suggested that she had evidence, presumably from her recorded conversations, of damaging admissions by Williford.  (Docs. 1 ¶¶ 24-26; 35 ¶¶ 28-30).  For example, the amended complaint alleges that Williford told Potter she was "banned from the LEC as a result of the support she and her husband gave to [Sheriff] Peavy's challenger" and thus would not be promoted to a full-time EMT position.  (Doc. 35 ¶ 29).  There is no evidence that Williford made such damaging admissions.

completely … political" and that she does not "politic" on the job.  (Docs. 37-26 at 4:1-4, 17-21; 49 at 2:20-2:51).  Williford simply responded that he knew she and her husband were "separate."  (Docs. 37-26 at 4:22-24; 49 at 2:50-3:02).  Potter then stated that she supported Williams.  (Docs. 37-26 at 4:25-5:2; 49 at 3:10).  To this comment, Williford replied that there were times he wanted to "cuss … out" the nurse at Houston County but that he also knew he could not do that.  (Docs. 37-26 at 5:3-11; 49 at 3:13-3:20). He also said that it is a "very bad situation all around" and that he is "doing what [he is] asked."  (Docs. 37-26 at 5:19-20, 6:15-16; 49 at 3:23-3:28, 4:20-4:22).

In another recorded conversation months later, Potter raised the issue of the ban again.  (Docs. 37-27; 49, Attachment E).  Potter complained that she "didn't do anything" and that her husband's support of Williams "should have no bearing on [her]." (Docs. 37-27 at 42:6-15; 49 at 39:25-45).  Williford vaguely responded "small town politics" and said that he does not control anything "down there."  (Docs. 37-27 at 42:22-24; 49 at 39:25-39:52).

In December 2012, after Sheriff Peavy's re-election, a full-time position became available at the EMS.  Potter, who is white, applied, but Williford selected Lee Wiley, who is white and was another part-time employee.  (Doc. 48-6 ¶ 92).  According to Williford, he based his decision on a written poll of the full-time EMTs asking whom they would rather work with.  (Docs. 37-19 at 123:24-124:21; 48-6 ¶ 85).  No one voted for Potter.  (Doc. 48-6 ¶ 86).  Williford testified that he was not surprised because "Potter [was] not liked by any members of [the] department."  (Doc. 37-19 at 100:19-25).  Potter does not dispute that she garnered no votes in the poll.  (Doc. 48-6 ¶ 86).

In June 2013, another full-time EMT position became available.  (*Id.* ¶ 93).  Only Potter and Sandera Woodson, another part-time EMT, applied.  (*Id.* ¶ 94).  Woodson was the only African-American employee at the time and had only been working at the EMS since November 2012.  (*Id.* ¶ 95).  It is undisputed that "Potter and Woodson had the same educational background and certifications" other than two additional ones Potter had.  (*Id.* ¶ 98).  One of these certifications was not used at the EMS, and another full-time EMT already had the other.  (*Id.* ¶¶ 99-100).  Potter had also been an EMT longer than Woodson.  (*Id.* ¶ 101).

To decide whether to promote Potter or Woodson, Williford testified that instead of a written ballot, he verbally asked the other employees "if anybody had any change in their mindset" about Potter; none did.  (Doc. 37-19 at 181:25-182:12).  However, coworkers Marvin Bowen, Dusti Fine, Andrew Patrick, and Tommy Phillips testified that Williford did not talk to them about whom they would prefer for the position.  (Docs. 37-6 at 18:18-25; 37-8 at 14:15-21; 37-12 at 23:11-24; 37-14 at 35:21-24).  Thus, Potter disputes the claimed results of Williford's verbal poll.

Williford promoted Woodson to the full-time position.  (Doc. 37-11 at 25:12-15).  Williford testified that he hired Woodson not because of her race, but because of her interactions with people in the community and her working with other public agencies and her coworkers.  (Doc. 37-2 ¶ 104; 37-19 at 205:14-206:3).  Williford argues that he would not hire someone like Potter who had issues with other public agencies, like the Sheriff's Office and the fire department, and issues with her fellow coworkers.  (Doc. 37-19 at 113:6-19, 138:5-8).  He further stated that if "Potter had … been an African-American who spoke 15 languages, she would not have been hired."  (*Id.* at 204:14-16).

In support of his position, Williford points to deposition testimony from Potter's coworkers discussing their opinion of her. Several coworkers criticized Potter for bad-mouthing and criticizing others, being demeaning and judgmental, or expressing a "know-it-all" attitude that "[n]obody could do anything as well as she could do it." (Docs. 37-9 at 13:1-14:18, 17:19-21; 37-10 at 14:19-15:1, 15:19-23, 16:9-16, 34:1-3, 38:12-15; 37-12 at 7:19-8:1; 37-11 at 14:8-19). However, several coworkers also testified that Potter's attitude was no more negative than any of their other coworkers and that everyone was negative. (Docs. 37-6 at 16:1-17:1; 37-8 at 7:12-10:4; 37-11 at 14:2-24; 37-9 at 7:4-10:4).

Potter met with Williford to question why he did not promote her, and she again secretly recorded the conversation. (Docs. 37-27; 49, Attachment E). Williford said he made his decision because of "the community's needs" and "diversifying so that we are meeting and being more interactive …with the tax payers." (Docs. 37-27 at 36:17-37:2; 49 at 33:45-33:40). He reiterated that this was an "opportunity to diversify our department." (Docs. 37-27 at 38:22-25; 49 at 35:00-36:00). Potter stated if she "read that correctly, [she] was not born the correct ethnic group." (Docs. 37-27 at 38:8-10; 49 at 35:15-36:30). Williford replied, "[W]e had an opportunity to bring in some different viewpoints." (Docs. 37-27 at 38:11-14; 49 at 35:15-36:30). He also stated he would "get a Hispanic" if he could to "cover all bases" and to have an EMT who speaks Spanish. (Docs. 37-27 at 39:20-25; 49 at 37:19-37:21). Finally, Williford reassured Potter that his decision was not based on anything she had done and emphasized that it "c[a]me down to paramedic [to] paramedic" and that "we need to diversify" and "[m]ake our service better fit the community." (Docs. 37-27 at 36:15-21; 41:4-17; 49 at 38:24-

39:00).  In an effort to explain his recorded comments, Williford testified that he did not

tell Potter her coworkers did not like her because he did not "want to hurt her feelings"

and she was "still working part-time."  (Doc. 37-19 at 206:16-25).

When asked in his deposition whether any county commissioners told him to hire

African-Americans, Williford testified that he received questions from several "very

vocal" citizens but not commissioners.  (*Id.* at 171:2-11).  However, Jeff West—

Williford's former EMT partner—testified that Williford told him that "he was being

questioned by the commission to hire an African-American" in 2011.  (Doc. 37-18 at

16:21-17:18).  T.J. Williams also testified that he recalled Williford in a county

commission meeting responding to questions asking "why they didn't have a black …

EMT."  (Doc. 37-21 at 48:22-50:12).

After Potter returned from maternity leave, she was not placed back on the

schedule.  Potter then filed this lawsuit, asserting First Amendment retaliation claims

pursuant to 42 U.S.C. § 1983 against all Defendants, First Amendment claims pursuant

to the Constitution of the State of Georgia against all Defendants, race discrimination

claims and claims for violations of the Equal Protection Clause pursuant to 42 U.S.C. §

1981 and § 1983 against Dooly County and Williford in his official and individual

capacities, a Title VII claim against Dooly County, a claim for tortious interference with

business employment relations against the Estate of Sheriff Peavy, and a claim for

punitive damages against all Defendants.  (Doc. 35).

## II.    DISCUSSION

### A.    Motion for Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### B. Qualified Immunity Standard

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "'Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply.'" *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). To meet this burden, a plaintiff must establish that "the officer's conduct amounted to a constitutional violation" and "the right violated was 'clearly established' at the time of the violation." *City of W. Palm Beach*, 561 F.3d at 1291. This two-step analysis may be done in whatever order is deemed most appropriate for the case. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The clearly established law[5] must provide a defendant with "fair warning" that her conduct deprived the plaintiff of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002). A plaintiff "can demonstrate that the contours of the right were clearly established in several ways." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012).

---

[5] Clearly established law in this circuit means decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

First, a plaintiff can show that "a materially similar case has already been decided." *Id.* (internal quotation marks and citations omitted).  Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id.* (internal quotation marks and citation omitted).  "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case law is unnecessary.'" *Id.* (citation omitted).  "[E]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

### C.     First Amendment Retaliation Claims

The Defendants argue that "Potter failed to present sufficient evidence to raise a jury question as to whether Williford and [Sheriff] Peavy violated the First Amendment" and that Sheriff Peavy and Williford are entitled to qualified immunity.  (Doc. 37-1 at 9). They further argue that Dooly County is entitled to summary judgment "[b]ecause Potter failed to present sufficient evidence her First Amendment rights were violated."  (*Id.* at 12).

Potter was a public employee at the time of the underlying events but only as to Williford and Dooly County.  Sheriff Peavy was not her employer, and thus, in relation to Sheriff Peavy, Potter was a private citizen.  Different standards apply when a plaintiff asserts a First Amendment retaliation claim as a private citizen against a public official and when she asserts the claim as a public employee against her employer.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  The parties' briefs lump the two First Amendment claims together, making it difficult in some circumstances for the Court to tell what the

parties contend with regard to a particular claim.  The Court will address the claims separately and do its best to follow the parties' arguments.

> ### 1.    Sheriff Peavy

Potter contends Sheriff Peavy banned her from the LEC in retaliation for her political support for his opponent.  For a private citizen to establish a First Amendment retaliation claim, she must demonstrate (1)"[her] speech or act was constitutionally protected"; (2) the defendant's "retaliatory conduct adversely affected the protected speech"; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett*, 423 F.3d at 1250.  "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (internal quotation marks and citation omitted).  For the third prong, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (quoting *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011)).  "[O]nce the plaintiff shows that her protected conduct was a motivating factor, the burden shifts to the defendant to show that [he] would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Castle*, 631 F.3d at 1197.

It is undisputed Potter engaged in protected political speech when she supported Sheriff Peavy's opponent for county sheriff, but the Defendants argue being banned from the LEC would not deter "a person of ordinary firmness from engaging in protected speech."  (Doc. 37-1 at 10).  Referring to both Sheriff Peavy and Williford, Potter argues

that the ban (1) caused resentment among her coworkers and (2) led Williford not to promote her.  (Doc. 48 at 13).  As to the second point, Potter never really explains how Williford's alleged adverse action—his failure to promote some two months after Sheriff Peavy's ban—is an adverse action to support her claim against Sheriff Peavy.  Perhaps she thinks that the ban precipitated Williford's adverse action, and thus Williford's failure to promote can be factored into the determination of whether Sheriff Peavy's ban would deter a person of ordinary firmness.  However, it is undisputed that Sheriff Peavy told Williford he did not want the ban to affect Potter's employment and that Williford testified his decision was based on the undisputed fact that no EMT wanted to see Potter promoted and on deficiencies in Potter's job performance unrelated to the ban.  (Docs. 37-13 at 71:15-72:3; 37-19 at 95:3-101:19, 115:2-7).  But perhaps it can be argued that because the ban had some impact on Potter's ability to do her job, it could well have factored into Williford's decision not to promote.

As to the first point, Potter cites testimony from her coworker Amber Goodman that "[p]eople were pissed" about the situation, that "it wasn't fair," and that [i]t didn't offer good patient outcomes."  (Doc. 37-10 at 22:1-24).  Whether such negative workplace consequences from the ban would deter a person of ordinary firmness from engaging in political speech is debatable.  *See Bennett*, 423 F.3d at 1254 ("[T]he effect on freedom of speech … need not be great in order to be actionable." (internal quotation marks and citation omitted)).

As to the third element, the Defendants argue "a reasonable jury could not find [Sheriff] Peavy's ban of Potter from the LEC was motivated by protected conduct or speech" because "[t]here is no admissible evidence to suggest [Sheriff] Peavy knew

Potter was campaigning for Williams." (Doc. 37-1 at 9). To show subjective motivation, a plaintiff may point to the temporal proximity between the protected conduct and the alleged retaliatory action. *See Bumpus v. Watts*, 448 F. App'x 3, 6-7 (11th Cir. 2011); *Kamensky v. Dean*, 148 F. App'x 878, 881 (11th Cir. 2005); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 745 (11th Cir. 1996). Here, contrary to the Defendants' assertion, there is evidence Sheriff Peavy was aware of Potter's campaigning in early September. Craig Peavy testified he and Sheriff Peavy had conversations about the Potters' campaign efforts at the "first of September, maybe, or June, August" when "the campaign efforts started," and Sheriff Peavy was certainly aware in late September that Potter was campaigning. (Doc. 37-13 at 78:2-16, 78:22-79:16). This is sufficient circumstantial evidence of Sheriff Peavy's allegedly retaliatory motive to withstand summary judgment. There is also a factual dispute with regard to whether Sheriff Peavy would have banned Potter absent her political speech given that he only banned her and not her partner.

Assuming that Potter has established her prima facie case, the Court turns to Sheriff Peavy's qualified immunity defense. The Eleventh Circuit has stated that "when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage." *Foy v. Holston*, 94 F.3d 1528, 1534-35 (11th Cir. 1996). "Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct— despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to immunity." *Id.* at 1535. In other words, where "the record undisputably establishes (a) that objectively valid reasons did exist for

the step [the defendant] took, and (b) that [the defendant] was motivated, at least in part, by these lawful considerations," a defendant is entitled to qualified immunity. *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1296 (11th Cir. 2000).

Here, it is undisputed that a nurse and jail administrator informed Sheriff Peavy that Potter ignored them and the information they had regarding an inmate's health. Indeed, Potter's argument acknowledges Sheriff Peavy was made aware of her alleged conduct. (Doc. 48 at 14). Potter notes that the nurse reported that "they," referring to Potter and her partner, "never spoke to the nurse or asked for any info on this patient" and "[t]hey did not do vital signs." (Docs. 37-24; 48-6 ¶¶ 67-68). Thus, Potter argues that banning her but not her partner demonstrates that Sheriff Peavy was motivated by her political conduct, and not by the report of her and her partner's misconduct. (Doc. 48 at 16). However, that Sheriff Peavy only banned Potter does not change the undisputed fact that there was a negative report about Potter's conduct, that he was informed by the nurse and the jail administrator about her conduct, and that this information led Sheriff Peavy to ban Potter from the LEC. In other words, that Sheriff Peavy did not ban her partner does not negate his, in part, lawful motive to ban Potter. Potter's testimony that she did not see a nurse does not change these facts. Whether she saw a nurse or not, it is undisputed that Sheriff Peavy was informed of her alleged misconduct. Thus, there is indisputable evidence that Sheriff Peavy was motivated, at least in part, by a lawful justification. And given this lawful motive, "no jury could find that reasonable [sheriffs] would never have done the things [Sheriff Peavy] did but for a discriminatory intent." *Foy*, 94 F.3d at 1535. Accordingly, the Estate of Sheriff Peavy is entitled to qualified immunity on this claim.

Because summary judgment is appropriate as to this claim, it is also appropriate as to Potter's claim for punitive damages based on Sheriff Peavy's alleged retaliation. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims against the Estate for violations of the Constitution of the State of Georgia and for tortious interference with business employment relations.  Accordingly, these state-law claims are dismissed without prejudice.

### 2.    Williford and Dooly County

Potter contends Williford and Dooly County retaliated against her by not promoting her to a full-time position.  The Supreme Court, in *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983), established a four-part test, commonly called the *Pickering* test, to determine whether retaliation against a public employee for her speech violates the First Amendment.  *See Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).  Pursuant to this test, a public employee must show:

> (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the [government] as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action.  If the plaintiff establishes these elements, the burden shifts to the defendant to prove, it would have made the same adverse employment decision absent the employee's speech.

*Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007) (citations omitted).

Potter contends that both of Williford's decisions not to promote her to full-time in December 2012 and in June 2013 were in retaliation for her political conduct. Specifically, Potter argues that Williford somehow "*adopted*" Sheriff Peavy's "illegal motive for barring Potter from the LEC … as his own," and thus violated her "First Amendment rights when he failed to promote her because of the ban."  (Doc. 48 at 14,

- 15 -

28) (emphasis added).  She similarly argued in response to the Defendants' motion for judgment on the pleadings that Williford "adopted and executed the necessary and foreseeable consequence of [Sheriff] Peavy's hatred when he denied the promotions specifically and knowingly because Potter was banned from the LEC by [Sheriff] Peavy for political reasons."  (Doc. 28 at 12).

Thus, Potter seeks to impute Sheriff Peavy's unlawful motive to Williford to establish the third element of the retaliation claim against him.[6]  However, Potter points to no evidence that Williford himself was subjectively motivated not to promote her to the full-time position because of her political activity.  At best, for the December 2012 decision, Potter can show Williford took the ban into account when considering her for the position, which is hardly surprising given, as Potter argues, the ban had some effect on her ability to perform her job duties.  However, to say Williford was influenced by the ban does not at all establish, or even suggest, that he was subjectively motivated by her political speech.  For the June 2013 decision, it is even clearer that there is not a scintilla of evidence that Williford was subjectively motivated by Potter's political conduct.  Thus, because Potter has failed to create a genuine issue of fact as to this

---

[6] In her response to the Defendant's motion for judgment on the pleadings, Potter suggested that she could meet her burden of establishing that Williford was subjectively motivated by her protected speech by using a sort of cat's paw theory.  (Doc. 28 at 12).  As she acknowledged then, however, such a theory applies, at most, in employment discrimination claims to hold an employer liable when it "has no discriminatory animus but is influenced by a subordinate supervisor's action that is the product of such discriminatory animus (cat's paw liability)."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013) (explaining the Supreme Court's decision in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)).  Here, Williford and Sheriff Peavy were the heads of separate entities.  Thus, this case does not involve an employer/subordinate supervisor relationship.  *See id.* at 1336 ("*Staub* is primarily a case about agency principles and vicarious liability ....").

element, Williford is entitled to summary judgment on this claim and the request for punitive damages premised on it.[7]

As for Dooly County, it cannot be held liable for the acts of Sheriff Peavy. *See Grech v. Clayton Cty. Ga.*, 335 F.3d 1326, 1336-37 (11th Cir. 2003). Dooly County can be held liable where its official policy or its unofficial custom or practice shown through the acts of a final policymaker causes a constitutional violation. *Id.* at 1329-30. However, Potter does not allege any official policy on the part of Dooly County, and she failed to create a genuine issue of fact whether Williford, as the alleged final policymaker, violated her constitutional rights. Accordingly, Dooly County is also entitled to summary judgment on Potter's First Amendment retaliation claim.

### D.   First Amendment Claim Pursuant to the Constitution of the State of Georgia

Potter premises her state First Amendment claim on the same conduct underlying her federal First Amendment claim. (Doc. 35 ¶¶ 48-55). For the same reasons there is insufficient evidence Williford and Dooly County violated Potter's federal First Amendment rights, there is insufficient evidence they violated her state First Amendment rights by the same conduct. Put another way, Potter has failed to show that they acted because of any political speech. In any event, Williford in his individual capacity is entitled to official immunity because there is no evidence he acted with actual malice. *See Peterson v. Baker*, 504 F.3d 1331, 1339 (11th Cir. 2007). Accordingly, summary judgment is appropriate.

---

[7] It is also undisputed that Williford had a lawful ground not to promote Potter in December 2012 and that he relied in part on that lawful ground when making his decision. Specifically, when Williford polled the full-time EMTs, no one voted for Potter, and everyone voted for the other candidate. (Docs. 37-19 at 91:12-92:12, 123:24-124:15; 48-6 ¶ 84). The wisdom of using a popularity test may be debatable, but Potter does not contend it was unlawful. Therefore, given this indisputable lawful motive, Williford is entitled to qualified immunity for the December 2012 failure to promote even if Potter had established a prima facie case.

### E.   Section 1983 Claims Against Williford in His Official Capacity

The Defendants argue that the § 1983 claims "against Williford in his official capacity are unnecessarily duplicitous" and thus should be dismissed because they are "tantamount to a claim against Dooly County."  (Doc. 37-1 at 13 n.6).  The Court agrees. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official capacity actions against local government officials ….").  Accordingly, Williford is entitled to summary judgment on all § 1983 claims against him in his official capacity.

### F.   Equal Protection Clause

Potter has asserted a § 1983 claim against Dooly County and Williford for an alleged violation of the Equal Protection Clause based on Williford's June 2013 decision not to promote her.  (Doc. 35 at 15-16).  These Defendants argue they are entitled to summary judgment because "[t]he Equal Protection Clause … does not apply to individualized personnel decisions made by governments."  (Doc. 37-1 at 14). However, the Eleventh Circuit has explicitly held in the employment discrimination context that "it is clearly established that the equal protection clause affords [individuals] a right to be free from racial discrimination."  *Busby*, 931 F.2d at 775.  Accordingly, Dooly County and Williford are not entitled to summary judgment on this ground.

The Court notes that Potter alleges separate counts for violations of the Equal Protection Clause pursuant to § 1983 and for race discrimination pursuant to "§ 1981 via … § 1983."  (Doc. 35 at 13, 15-16).  These claims in the context of this case are analyzed under the same framework and challenge whether the Equal Protection

Clause was violated.[8]  *See Crawford v. Carroll*, 529 F.3d 961, 970-78 (11th Cir. 2008)
(referring to the claim as an "equal protection race discrimination claim"); *see also Lee
v. Conecuh Cty. Bd. of Educ.*, 634 F.2d 959, 962 (5th Cir. 1981).[9]  Accordingly, the
Court discusses the merits of the equal protection race discrimination claim below.

### G.    Equal Protection Race Discrimination

Potter has asserted equal protection race discrimination claims pursuant to §§
1981 and 1983 against Dooly County and against Williford in his individual capacity.
Potter has also asserted a Title VII claim against Dooly County.  (Doc. 35 at 13-14).
Again, these claims are based on Williford's June 2013 decision not to promote her.

### 1.  Sections 1981 and 1983 claim against Dooly County

Dooly County argues it "cannot be held liable under § 1983 because Potter failed
to introduce evidence she was harmed by an official policy or custom or final
policymaker of Dooly County."  (Doc. 37-1 at 13).  As to federal claims under § 1983,
there are "strict limitations on municipal liability."  *Grech v. Clayton Cty.*, 335 F.3d 1326,
1329 (11th Cir. 2003) (en banc).  "A local government may be held liable under § 1983
only for acts for which it is actually responsible, acts which the [local government] has
officially sanctioned or ordered."  *Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1287 (11th

---

[8] Potter alleges in her complaint that "[n]o compelling or other governmental interest supports the Defendants' use of race as a basis for the employment decision."  (Doc. 35 ¶ 73).  The Court acknowledges that if Potter were challenging the Defendants' decision not to promote her based on a policy, statute, effort, or program, like an affirmative-action plan, where race is taken into account, and if the Defendants were to claim they relied on such a reason for their decision, then the Defendants would be required to meet a strict scrutiny test as to Potter's Equal Protection Clause claim.  *See, e.g.*, *In re Birmingham Reverse Discrimination Litig.*, 20 F.3d 1525, 1544 (11th Cir. 1994).  However, there is no evidence of this, and the Defendants disavow that the decision not to promote Potter had anything to do with race.  Accordingly, the Court construes the claims as an equal protection race discrimination claim analyzed under the *McDonnell-Douglas* framework.

[9] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Cir. 1998) (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-90 (1986)).  This type of liability can be established "only when the [municipality's] 'official policy' causes a constitutional violation."  *Grech*, 335 F.3d at 1329 (citation omitted).  One way to show that a city policy caused a constitutional violation is "through the ... acts of a final policymaker."  *Id.*

To hold a municipality liable for the conduct of its final policymaker, the plaintiff must first show that the local government "has authority and responsibility over the governmental function in issue."  *Id.* at 1330.  Second, the plaintiff must "identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue."  *Id.*  To determine whether an officer is the final policymaker, the Court looks to "the relevant positive law, including ordinances, rules and regulations" and to "the relevant customs and practices."  *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). "[T]he identification of the final policymaker is a question of state law for the trial judge…."  *Id.*

Potter does not allege any policy or custom on the part of Dooly County.  Rather, she argues that Dooly County is liable for Williford's actions because he is the final policymaker with respect to employment decisions at the EMS.  (Doc. 48 at 26).  Dooly County contends there is no evidence the County Administrator delegated employment decisions to Williford as EMS director.  (Doc. 37-1 at 14).  The Court disagrees. Pursuant to Dooly County Ordinance § 2A(h)(9), the County Administrator may "suspend, discharge, transfer, or remove all employees for whom the Board [of

Commissioners] is responsible." [10]   The ordinance then provides that "[t]he County Administrator may delegate to any department head such powers with the respect to subordinates within that department."   *Id.*   Dooly County points to the EMS policy for "Disciplinary Actions" that the County Administrator reviews in conjunction with the EMS director and argues that this is clear evidence the County Administrator did not delegate employment decisions to Williford.  (Docs. 37-1 at 14; 37-25).  However, this policy deals with disciplinary actions that may result in "possible termination."  (Doc. 37-25).  It does not involve hiring or promotion decisions.  Further, in discussing his responsibilities as director of the EMS, Williford admitted in his deposition that he has "the power to hire and fire," that nobody reviews his hiring decisions, and that it is his exclusive decision whether an employee moves from part-time to full-time.  (Doc. 28-2 at 21:3-24).  Thus, Dooly County has not established that Williford was not the final policymaker with respect to decisions to promote someone to full-time, and Dooly County is not entitled to summary judgment on this ground.

### 2. Sections 1981 and 1983 claims against Williford in his individual capacity and Dooly County and the Title VII claim against Dooly County

Sections 1981 and 1983 claims and Title VII claims generally "have the same requirements of proof and use the same analytical framework"; thus, the Court can "address the Title VII claim with the understanding that the analysis applies to the § 1981 [and § 1983] claim[s] as well."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Therefore, the Court will address Potter's Title VII claim against Dooly County with the

---

[10] Dooly County cites and quotes the ordinance, which can be found at
https://www.municode.com/library/ga/dooly_county/codes/code_of_ordinances.

understanding that the same analysis applies to her §§ 1981 and 1983 claims against Williford and Dooly County.

In the absence of direct evidence, Potter, like most plaintiffs alleging single-motive race discrimination, relies on circumstantial evidence and the framework for analyzing circumstantial evidence[11] first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Peterson v. Bd. of Trs. of the Univ. of Ala.*, \_\_F. App'x\_\_, 2016 WL 806042, at *3 (11th Cir.). Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of discrimination. With regard to a failure- to-promote claim, a plaintiff must show that (1) she is a member of a protected minority, (2) she was qualified and applied for the promotion, (3) she was rejected, and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).

If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

---

[11] Potter does not argue that there is direct evidence of discrimination. Rather, she states that "Williford's recorded statements come very close to constituting direct evidence." (Doc. 48 at 24).

The plaintiff then has the burden to show that the employer's stated reasons are in fact pretext for discrimination.  *Id.*  "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Id.* (quoting *Burdine*, 450 U.S. at 256); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'"  *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)).  "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation omitted).

As to her prima facie case, Williford and Dooly County argue that Potter has not established the second element "because she cannot demonstrate she was qualified for a full-time position at DCEMS."  (Doc. 37-1 at 16).  Specifically, Williford and Dooly County contend "[t]here is substantial evidence Potter had negative relationships with the other full-time EMTs."  (*Id.*).  Citing *Vessels v. Atlanta Independent School System*, 408 F.3d 763 (11th Cir. 2005), Potter responds that the "Defendants cannot contest [her] *prima facie* case with subjective reasons."  (Doc. 48 at 23).  In *Vessels*, the defendant argued the plaintiff failed to show he was qualified for the position "because he lacked the leadership style they preferred."  480 F.3d at 768.  The Eleventh Circuit

rejected this argument and explained that "such subjective criteria have no place in the plaintiff's initial prima facie case." *Id.* at 768-69.

Here, like the defendants in *Vessels*, Williford and Dooly County challenge Potter's qualifications based only on subjective criteria regarding her relationships with coworkers. However, Potter must only show that "she satisfied [her] employer's objective qualifications." *Id.* at 769. It is undisputed that Potter met those objective qualifications. (Doc. 48-6 ¶¶ 80-82). And Williford and Dooly County do not challenge the other elements of Potter's prima facie case.

The burden of production thus shifts to Williford and Dooly County to articulate a legitimate, nondiscriminatory reason for the employment action. This burden is "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). The Defendants have provided legitimate, nondiscriminatory reasons not to promote Potter to a full-time position: the full-time EMTs did not want to work with her, and she "did not get along with any other public service agency." (Doc. 37-1 at 17). *See Vessels*, 408 F.3d at 668-670 (concluding the defendant's "appraisal of [the plaintiff's] leadership qualities" was a legitimate, nondiscriminatory reason). Potter does not dispute the Defendants met their burden. Rather, she argues these reasons were pretext for race discrimination. (Doc. 48 at 24).

With respect to pretext, "an employer's true motivations are particularly difficult to ascertain"; thus, "factual determinations [are] generally unsuitable for disposition at the summary judgment stage." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). "The focused inquiry … requires the plaintiff to demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Combs*, 106 F.3d at 1538 (internal quotation marks and citation omitted)).

Here, it is clear there is a genuine issue of fact whether the proffered nondiscriminatory reasons for not promoting Potter were pretext for discrimination. While Williford testified he had legitimate reasons not to promote Potter, in his recorded conversation he said that he chose to promote Woodson over Potter to diversify the department and that he would hire a Hispanic EMT if he could to "cover all bases." (Docs. 37-19 at 113:6-19, 138:5-8; 37-27 at 36:17-37:2, 38:8-14, 39:20-25; 49, Attachment E at 37:19-37:21).  In other words, he rejected Potter because she was white and Woodson was African-American.

Similarly, Potter has adduced evidence that directly contradicts Williford's proffered reasons.  Contrary to his testimony that he based his decision on Potter's issues with coworkers and public agencies, Williford reassured Potter in the recorded conversation that his decision had nothing to do with anything she had done and was meant to "diversify" the department and better fit the community's needs.  (Docs. 37-27 at 36:15-21, 41:4-17; 49, Attachment E at 38:24-39:00).  Further, while Williford testified that he verbally asked the other EMTs whom they would rather work with, several employees denied Williford ever asked them.  (Docs. 37-6 at 18:18-25; 37-8 at 14:15-21; 37-12 at 23:11-24; 37-14 at 35:21-24).  And Potter provided testimony from other coworkers that she was no more negative than anyone else working at the EMS. (Docs. 37-6 at 16:1-17:1; 37-8 at 7:12-10:4; 37-11 at 14:2-24; 37-9 at 7:4-10:4).

Finally, contrary to Williford's testimony that he was not receiving pressure from commissioners to hire an African-American, his former partner testified that Williford told him "he was being questioned by the commission to hire an African-American," and T.J. Williams recalled being at a county commission meeting where Williford responded to questions from the "committee" about why there was no African-American EMT.  (Docs. 37-18 at 16:21-17:18; 37-21 at 48:22-50:12).

Clearly, Potter has sufficiently demonstrated pretext to avoid summary judgment.[12]  Accordingly, summary judgment is inappropriate as to the §§ 1981 and 1983 and Title VII claim against Dooly County, and it is likewise inappropriate as to the §§ 1981 and 1983 claim against Williford in his individual capacity, unless he is entitled to qualified immunity.

### 3. Qualified Immunity

Williford argues he is entitled to qualified immunity.  (Doc. 37-1 at 18).  It is undisputed that Williford was acting within his discretionary authority when making employment decisions.  Further, the Court has concluded that a reasonable jury could find that Williford discriminated against Potter based on her race when he did not promote her to a full-time position.  Thus, the question is whether the law was clearly established at the time of his employment decision that his conduct was unlawful.

Williford contends the law was not clearly established his conduct was unlawful because "there was no reason for Williford or a reasonable, similarly situated person to

---

[12] The Defendants add they had a legitimate, non-discriminatory reason not to promote Potter because "Potter and her husband were known and disliked by public service agency employees for operating vehicles the Potters intentionally made to look like Sheriff's Office vehicles."  (Doc. 37-1 at 17).  However, although Williford testified that he was aware the Potters had issues with the Sheriff's Office "several years back or several months back," he would not testify about the details of those issues, called them rumors, and said that "[i]t didn't bother [him]" and "[i]t didn't affect [his] position or employ" or his impression of her as an employee.  (Doc. 37-19 at 60:9-63:17).

know choosing to promote an African-American candidate over a disliked and controversial white candidate would violate any constitutional or statutory provisions." (Doc. 37-1 at 18).  This argument is so cursory that it is meaningless.  Williford may be attempting to suggest that this is a mixed-motive case and that there is no clearly established law the purported lawful basis for his decision was unlawful.[13]  *See Rioux*, 520 F.3d at 1283-84.  However, for the same reasons Potter has sufficiently shown pretext, it is not indisputable that Williford had a lawful ground on which to base his decision and did in fact rest his decision on that ground.[14]  When there is not indisputable evidence an employer was motivated, at least in part, by lawful justifications, the law is clearly established that a public employer violates the Equal Protection Clause if he discriminates against an employee because of her race.  *See Bogle v. McClure*, 332 F.3d 1347, 1355 (11th Cir. 2003); *Lawson v. Curry*, 244 F. App'x 986, 988 (11th Cir. 2007); *Jolivette v. Arrowood*, 180 F. App'x 883, 885-86 (11th Cir. 2006).  Thus, Williford has not established that he is entitled to qualified immunity for his June 2013 decision not to promote Potter.

### 4.  Punitive Damages

The Defendants argue that "Dooly County … [is] shielded from punitive damages under Title VII and § 1983."  (Doc. 37-1 at 19).  The Court agrees.  As to the § 1983 claim, the Supreme Court has stated "that a municipality is immune from punitive

---

[13] The Court notes that "general assertions" that an employment decision was based on "subjective criteria" such as "commitment to organization, personality, work habits, and personal observation … do not constitute indisputable evidence that [a defendant] was motivated by lawful considerations."  *See Ham v. City of Atlanta, Ga.*, 386 F. App'x 899, 906 (11th Cir. 2010) (internal quotation marks omitted).

[14] Williford does not argue the December 2012 poll was the indisputable basis for his June 2013 decision, nor is there indisputable evidence to establish that.  Again, while Williford testified that he asked if anyone's mind had changed after the December 2012 ballot, several employees testified they were never asked about their EMT preference for the June 2013 position.

damages ...." *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  As

to the Title VII claim, in the Civil Rights of Act of 1991, Congress laid out the availability

of punitive damages for certain violations of Title VII.  *See* 42 U.S.C. § 1981a.  This Act

provides:

> A complaining party may recover punitive damages under this section
> against a respondent (other than a government, government agency or
> political subdivision) if the complaining party demonstrates that the
> respondent engaged in a discriminatory practice or discriminatory
> practices with malice or with reckless indifference to the federally
> protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1).  Thus, it is apparent that "Title VII plaintiffs may not recover

punitive damages against governments and government agencies or political

subdivisions," such as Dooly County.  *McGriff v. Decatur Cty. Sheriff's Office*, 2005 WL

1899392, at *1 (M.D. Ga.); *see also Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1322

(11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th

Cir. 2003).  Accordingly, summary judgment is appropriate as to this claim.

As for Williford, he argues "Potter has presented no evidence to permit the

inference [he] acted with malice or reckless indifference to Potter's federally protected

rights" and thus she is not entitled to punitive damages.  (Doc. 37-1 at 20).  In a § 1983

action, "a jury may be permitted to assess punitive damages … when the defendant's

conduct is shown to be motivated by evil motive or intent, or when it involves reckless or

callous indifference to the federally protected rights of others."  *Kolstad v. Am. Dental

Ass'n*, 527 U.S. 526, 536 (1999) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  In

the context of employment discrimination, the Eleventh Circuit has stated the *Kolstad*

standard for punitive damages is satisfied where there is "a showing of intentional

discrimination" and "a showing that the employer acted with knowledge that it may be

acting in violation of federal law." *Alexander*, 207 F.3d at 1337 (internal quotation marks and citation omitted).  Here, "there is no argument or evidence that [Williford] genuinely believed that racial discrimination in the context of this case was permissible." *Lambert v. Fulton Cty.*, 253 F.3d 588, 597 (11th Cir. 2001); *see also Bogle*, 332 F.3d at 1359-60. Further, there is a genuine issue of fact whether Williford intentionally discriminated against Potter on the basis of race.  Thus, summary judgment is inappropriate as to Potter's request for punitive damages.

### III.   CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED in part** as to the federal First Amendment claim against the Estate of Sheriff Peavy; the federal and state First Amendment claims against Williford and Dooly County; all claims pursuant to § 1983 against Williford in his official capacity; the request for punitive damages against the Estate of Sheriff Peavy and Dooly County; and the request for punitive damages against Williford based on the First Amendment retaliation claim.  The motion is **DENIED in part** as to the §§ 1981 and 1983 claims for equal protection race discrimination against Williford in his individual capacity and Dooly County, the Title VII claim against Dooly County, and the request for punitive damages against Williford based on the race discrimination claim.  Because the Court declines to exercise supplemental jurisdiction over the claims against the Estate of Sheriff Peavy for violations of the Constitution of the State of Georgia and tortious interference with business employment relations, these claims are **DISMISSED without prejudice**.

**SO ORDERED**, this 26th day of April, 2016.


S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT